## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

**v.**                                   **Criminal Action No: 1:08CR5**

**CORY BRIDGES and**
**MEGAN ROSE OLIVERIO,**
          **Defendants.**

## REPORT AND RECOMMENDATION/OPINION

On the 26th day of February, 2008, came the defendants, Cory Bridges, in person and by

Thomas G. Dyer, his attorney, and Megan Oliverio, in person and by her attorney, Deanna

Pennington, and also came the United States by its Assistant United States Attorney, Shawn Angus

Morgan, for a hearing on Defendants' joint Motion to Suppress, which motion was filed on February

19, 2008 [Docket Entry 25].   The United States filed its Response to the Motion on February 22,

2008 [Docket Entry 29].

## I.  Procedural History

A grand jury attending the United States District Court for the Northern District of West

Virginia returned a three-count indictment against Defendants on January 8, 2008.  Said indictment

charges both defendants with  Conspiracy to Possess with Intent to Distribute and to Distribute Less

than Fifty Kilograms of Marijuana (Count One); charges Defendant Bridges with Possession with

Intent to Distribute Less than Fifty Kilograms of Marijuana Within 1000' of a Protected Location

– Aiding and Abetting (Count Two); and charges Defendant Oliverio with Maintaining a Drug-

Involved Premises within 1000' of a Protected Location (Count Three).   Both defendants were

arraigned on January 23, 2008, and entered pleas of "Not Guilty" to all counts. On February 19,

Defendant Bridges filed his Motion to Suppress [Docket Entry 25].   On February 19, 2008,

Defendant Oliverio requested the Court's leave to join in Bridges' Motion [Docket Entry 26]. The

Court Granted Defendant Oliverio's Motion to join on February 20, 2008 [Docket Entry 27]. This matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation by then Chief District Judge Irene M. Keeley by Order entered February 21, 2008 [Docket Entry 28].

In their joint Motion, Defendants move the Court to suppress any and all evidence seized as a result of the October 30, 2007, warrantless search of their residence, including evidence obtained pursuant to a subsequent search warrant or other "fruits of the poisonous tree."

The undersigned conducted an evidentiary hearing on the joint motion on February 26, 2008. A transcript of the suppression hearing was made and filed March 13, 2008.

## II. Contentions of the Parties

A. Defendants contend the warrantless search of their residence, on October 30, 2007, violated their constitutional rights because:

1. The police did not have a warrant to search their home.

2. The police did not have probable cause to search their home.

3. Defendant Bridges did not give consent to search his home.

4. No exigent circumstances existed to permit the unwarranted search.

5. No other exception existed to the Fourth Amendment requirement that the police obtain a warrant prior to the search of their home.

B. The Government concedes that police did not have a warrant to search Defendants' residence the first time on October 30, 2007[1], but argue:

---

[1] Police did obtain a search warrant after finding the marijuana pursuant to the warrantless search.

2

1. Either the "exigent circumstances" doctrine or the "emergency aid" doctrine justified the officers' warrantless entry into Defendants' residence and the brief search.

2. Defendant Bridges consented to the officers' brief search of his residence.

3. The marijuana and digital scales which formed the basis for the subsequent search warrant and seizure were in "plain sight" when the officers performed the first search.

### III.  Statement of Facts

During the suppression hearing, the undersigned  received the testimony of five witnesses under oath, to wit: City of Bridgeport Police Officer Jay Williams; City of Bridgeport Police Officer Scott Floyd; Harrison County Sheriff's Department Deputy Michael Weiss; Defendant Cory Bridges; and Defendant Megan Oliverio.  The Court also received three exhibits in evidence, these being marked as Government Exhibits Nos. 1,  2, and 3, which are, respectively, a diagram of the residence, a printout of recorded Taser firing data, and  the typewritten CAD 911 incident report log.

From the evidence, the undersigned finds the following facts to be undisputed and relevant to the issues raised by the parties:

1. On October 30, 2007 Cory Lashawn Bridges, hereinafter called "Bridges," was a resident of the City of Bridgeport, West Virginia living at 604 Sherwood Forest Drive with Megan Oliverio, hereinafter called "Oliverio," and their child, Jalen Bridges.  Tr. 90.

2. Jalen Bridges was six years old as of the date of the subject warrantless search of his parents' residence by police.  He was tall for his age.  Tr. 90.

3. For approximately 1 and ½ hours to 2 hours prior to the arrival of the police,  Bridges and Jalen Bridges had been at the residence alone loudly playing video games in the back den room.   Oliverio was not at home.   Tr. 91, 104, 99, 97-98.

4. On October 30, 2007 at approximately ten minutes to six (6:00) p.m. Police Officer Jay Williams (hereinafter referred to as "Lead Officer") of the City of Bridgeport Police Department, received a Harrison County Center 911 dispatch call "of a possible domestic happening" at 604 Sherwood Forest Drive in Bridgeport. Tr. 4-5, 41.

5. Lead Officer understood from what he had been told by the dispatcher that the caller was anonymous, lived directly above the residence, and the caller stated "she could hear what appeared to be arguing between a male and female occurring at that residence." Tr. 5, 18.

6. The Lead Officer did not know of anything that had been going on inside the residence in question "other than an argument" as reported to the 911 dispatcher and in turn reported to him. Tr. 21.

7. At the time of the call, the Lead Officer had a total of five years police work experience, two of which were with the Weston Police Department and the remaining three of which were with the Bridgeport Police Department. Tr. 18. Prior to this call, he had responded to "numerous" (dozens) of domestic calls but none at this particular residence or involving Bridges or Oliverio. Tr. 21, 25.

8. Upon receipt of the call, Lead Officer "responded almost immediately." He arrived at the scene in his police cruiser with emergency blue lights and sirens running within a few minutes of receiving the call. Tr. 5, 19.

9. The Lead Officer described 604 Sherwood Forest Drive as a "condo or duplex building" in which there were "multiple residences within one section of the building" and in which one family unit could be downstairs and another family unit could be above or beside it. Tr. 5-6.

10. Upon arrival, the Lead Officer "went to the residence in which the nature of the call was

possibly coming from" and knocked on the door "a series[2] of times." Tr. 5.

11.    As Lead Officer approached the residence he did not hear any sound coming from within the apartment.  He did he not see anything going on within the apartment through any of the windows or see any silhouette of any activity.  Tr. 19.

12.    Lead Office did not attempt to locate the anonymous caller and inquire of the caller about the facts that had been relayed by the 911 Comm Center.  Tr. 19.

13.    Lead Officer felt he had an urgent need to get inside the residence to look around because: "And [sic] emergency 911 call was placed which I had responded to, advising there was a -- a domestic or an argument, or a disturbance in nature at that location." Tr. 38.

14.    Lead Officer stated he had been trained (instructed) at the West Virginia State Police Academy to make entry in the residence of a suspected domestic  regardless of what he observes on or at  the scene.  If it is a domestic call, he is going to try to gain entry to insure no injured persons are within the area.  Tr. 20.  He said it was his training to enter regardless of consent simply because a domestic had been called in so he can check to make sure there are no harmed persons in the area.  Tr. 23-24.  The following colloquy is particularly instructive with respect to the Lead Officer's interpretation of his training and his right to enter a residence without a warrant when responding to a possible domestic call:

    Q.    Okay.  And let me ask you this, when you entered, actually entered the residence itself, were you relying upon Mr. Bridges, I guess invitation to come in or, were you relying on the fact that this is a domestic call and I'm going in no matter what?
    A.    Relying on the fact that it was a domestic in nature, and safety check would be done of the residence.
    Q.    So whether Mr. Bridges consented or not, you were going in?

_____

[2]"Series" means three separate events of knocking on the door of the residence.  Tr. 5-6.

A. To check the welfare, yes.

Lead Office Williams confirmed his belief that he had the right to enter the premises without a warrant because he was responding to a 911 call advising of a domestic or an argument in the following redirect examination of the Assistant United States Attorney:

Q. You have said several times on cross-examination, that it was your intent to make access to the residence even if Mr. Bridges had not consented to you taking a look around. What was the reason for that, what was your urgency in feeling like you needed to get insider [sic] there and look around?"

A. And [sic] emergency 911 call was placed which I had responded to, advising there was a - - a domestic or an argument, or a disturbance in nature at that location. Tr. 38.

With respect to the police and their belief that they had the right to enter Bridges' residence because a possible domestic incident had been called in, Bridges testified that the police told him "that they have the right to come into the apartment." Tr. 92, 112.

15. After the third knock on the door, Bridges answered the door. Tr. 5-6.

16. Lead Officer responded stating he was a police officer and "advised him, the voice to open the door." Tr. 5, 6.

17. Lead Officer testified he could not hear anything from inside the residence during the period surrounding the first, and second series of knocks on the door. Tr. 6.

18. Bridges opened the door in response to Lead Officer's demand.

19. Bridges only partially opened the door permitting Lead Officer to see "half of the person in the doorway." Lead Officer "moved the door to make sure [he] could see the whole person" (Tr. 21); pushed the door open so he could gain visual access to Bridges and to the rest of the residence (Tr. 32); and told Bridges to put his hands in the air, pull up his shirt slightly and turn around for the purpose of the officer doing a weapons check.

20. Bridges complied and held up his hands, pulled up his shirt slightly and turned around. Tr. 7, 108.

21. No weapons, drugs or contraband were seen on Bridges. Tr. 8, 22, 26.

22. Lead Officer then explained to Bridges that he had received a 911 call stating "that there was a disturbance at that location, possibly a domestic, a female's voice." Tr. 8.

23. Lead Officer observed nothing remarkable about Bridges. Tr. 22.

24. At approximately the same time as Bridges was opening the door, Officer Scott Floyd (hereinafter referred to as Back-up Officer) arrived and approached the door area behind Lead Officer. Tr. 6, 51-52. Back-up Officer confirms Lead Officer was already at the door of 604 Sherwood Forest Drive speaking to Bridges through the open door. Tr. 41-42.[3]

25. Lead Officer did not update, did not tell the Back-up Officer what was happening because he "didn't feel there was any need or any time to." Tr. 33, 38, 54, 55.

26. Bridges told the officer "there was no problem going on there" and "there wasn't a female there." Tr. 8, 24.

27. Lead Officer asked Bridges "what could be the source of the yelling that we're getting a report from." Tr. 8, 24.

28. Bridges responded stating "that he didn't recall of any yelling or later averred that he and his son had been playing video games and he had also been asking him to clean his room." Tr. 8, 24, 106. Bridges told Lead Officer that a woman lived at the residence but that she had not been there for some time. He said he told them she had come home for no more than

---

[3]The CAD (Government Exhibit 3) contradicts the officers' testimonial version of the order of their arrival.

five minutes, dropped their son off, talked to her sister on the phone and then left again. Tr. 9, 106-107.

29. It did not occur to Lead Officer at that time that the female voice the anonymous caller thought she heard could have been that of a young child involved in playing video games with his father. Tr. 25.

30. Oliverio testified that: October 30, 2007 was a Tuesday; her son, Jalen, had been in school during the day; he took the bus from school to Maple Lake where his grandparents reside; he arrived there around 3:45 pm; she arrived to pick him up and took him home to 604 Sherwood Forest Drive around 4:10 pm; she came in the house briefly, talked to Cory Bridges about dinner, spoke to her sister on the phone, and left to go shopping around 4:20 pm. Tr. 123-126.

31. The Back-up Officer, a two year veteran of the Bridgeport Police Department, also received his training from the West Virginia State Police Academy. Tr. 40.

32. Back-up Officer states the Academy training manual requires an officer answering a possible domestic call to "take into consideration the totality of the circumstances that may be available to [him] and the other officers ... at the time of the call" and to weigh circumstances such as: "someone bleeding," "blood on the floor" or "demeanor of the person you're talking with" more than other circumstances. Tr. 70-73.

33. Back-up Officer testified that there was no department written policy on how to respond to domestic type calls (Tr. 69) but his training from the State Police Academy required him to be persistent in gaining entry to check to make sure someone was not injured; but not to barge in a residence without a warrant. Tr. 60, 70 and 72-73. Based on his training he was

prepared to "[s]tand there, keep knocking on the door. Because in - - in the way I see it, if there is a domestic there, if - - if he knows I'm outside or the individual knows I'm outside, they're not going to continue with what was going on. If they do, then I'll hear something which gives me the reason then to go through the front door." Tr. 62.

34. While at the door Lead Officer did not see or hear anything that led him to believe that someone may be harmed in the residence. Tr. 25. He did not call out for anyone inside the apartment because he did not feel there was a "guarantee that, if someone was in there," they would respond. Tr. 25.

35. Neither officer could see what was in the rooms beyond the living room because of partition walls. Tr. 110.

36. On arrival Back-up Officer:  did not "know anything other than it was a domestic in progress, whether it was a man, woman, two men, parent-child" (Tr. 41);  "did not hear yelling coming from within the apartment" (Tr. 55); did not question the child about what happened before the officers arrived even though he could see the child in the back of the living room behind Bridges (Tr. 52); did not know whether or not [what was reported by the anonymous caller] was people playing a video game or they were screams of  - - of pain or threats of violence or anything of that nature" (Tr. 58); there was nothing about Bridges' or his son's appearances that indicated that any violence had been going on (Tr. 61);  had no "knowledge nor any probable cause to believe or suspect that - - that a felony had happened in this residence" (Tr. 59);  had not observed a misdemeanor occurring in his presence (Tr. 60); "[d]idn't hear anybody moving around in the apartment" (Tr. 63); "[d]idn't hear any other noises within the apartment that led [him]  to conclude there may be somebody else

in [there] (Tr. 63); smelled "the distinct odor of marijuana coming from" Bridges[4] (Tr. 63); had not received a report of shots fired (Tr. 65); had not received a report of hearing furniture breaking and did not hear furniture breaking (Tr. 65); had no "information of screams of threats of serious physical harm or violence" (Tr. 65); did not see or hear a television or hear a radio (Tr. 66); did not see any broken furniture, vases, lamps, or turned over or damaged tables (Tr. 66)[5]; could see that the living room looked neat and orderly (Tr. 67); other than some toys, did not see anything thrown about on the floor (Tr. 67); did not consider it strange or unusual that a person would be upset at the police being at the front door (Tr. 68); saw no marks about Bridges' face or hands that would indicate that he had been in any kind of a confrontation (Tr. 68); saw no tears in Bridges' eyes (Tr. 68); saw nothing in Bridges' eyes indicative of drug influence (Tr. 68); both Bridges and his son were neatly dressed (Tr. 69); Bridges was not observed to be breathing hard (Tr. 69); there was "nothing about the circumstances that [he found] at [the] location which - - which would

---

[4]Back-up Officer Floyd never imparted the smelling of marijuana to Lead Officer Williams and Williams never testified that he smelled an odor of marijuana on Bridges prior to entry into the house, so the fact that Floyd smelled the odor of marijuana on Bridges or his heightened concern that "the use of drugs might be some reason as to why there might be a domestic in progress" could not be a fact taken into consideration by Lead Officer Williams in entering Bridges' residence without a warrant. Tr. 63-64.

[5]On cross-examination, the Assistant United States Attorney asked Bridges to explain a turned over lamp shown in photographs taken by police during their investigation but after Bridges had been taken down, Tasered and secured. Bridges' explanation confirmed what he and the police had already stated in their testimony, to wit: That nothing was broken or turned over. The relevant testimony is: "A. There was no lamp, no vases, no nothing turned over in the living room, ma'am. Q. Can you explain why the photographs that were taken before the search warrant was executed, showed that a lamp was knocked over in the front living room? A. Probably when the police officers threw me down on the ground, that's when the lamp probably got turned over." No photographs were introduced during the hearing and no officers were called to provide rebuttal.

give rise to a belief that there was any type of emergency that existed at this - - this residence at [the] time." Tr. 60.

37.     Notwithstanding his own observations, Back-up Officer included in his report and in the sworn affidavit to support the criminal complaint that he and Officer Williams (Lead Officer) had heard yelling coming from within the residence. Both officers testified, and it is undisputed that they had not actually heard any yelling. Back-up Officer included this information in his report and sworn affidavit because he had heard Lead Officer (Williams) ask Bridges about yelling. From that he (Floyd) assumed Williams had heard yelling coming from the apartment. Tr. 56-57. At no point prior to preparing the criminal complaint and certainly not before entry did Back-up Officer and Lead Officer converse about what Lead Officer had heard or not heard or in any way confirm the erroneous assumption Back-up Officer had reached concerning yelling coming from the residence. Tr. 57-58.

38.     As Lead Officer and Bridges conversed at the door, Lead Officer and Back-up Officer could each see Bridges' son in the back of the living room behind Bridges. Tr. 8. Lead Officer believed Bridges' son to be between seven and ten years old. Tr. 9. He testified he observed nothing remarkable about the son. Tr. 22. He testified: "I actually observed no demeanor. The child was just standing there." Tr. 32.

39.     Lead Officer did not question the child at any time prior to conducting the search of the residence because he said he had no reason to do so. Tr. 24, 33, 52. Lead Officer explained he felt it more important to check the premises for any emergencies and knew he could question the child later if needed. Tr. 37-38. He testified he did not even ask the child if he was ok at any time until after he and the Back-up Officer had entered the apartment, and

Tasered and secured Bridges.[6]  Tr. 33.  He testified it would not have mattered what the child might have said in response to any question asked because he, Lead Officer, intended to enter the residence anyway. Tr. 24-25.

40.    Back-up Officer described his training as follows: "[T]hey just train you to - - I mean, it's just a - I don't know how to put it in words.  They tell you to look for all these little things.  But as far as on domestic situations because of the number of people who have been hurt and killed and things like that, that on a domestic situation, you need to be persistent on entering the house to ensure that no one is injured in the house.  And mostly get consent.  I mean, that what we're - - that's what we're trained to do it to - - to get that consent." Tr. 72.

41.    Lead Officer testified he asked Bridges if the officers could check inside the residence to make sure there was nobody in there that was injured or anything.  Tr. 9.

42.    Back-up Officer recalls "Officer Williams was asking Mr. Bridges what was going on, what the problem was.  And Mr. Bridges stated that there was no problem and went to shut the door and walk back in the residence.  And we asked him to come back and talk to us because we had had a report that there was a domestic in progress . . . . He stayed at the front door and talked to us for a little bit.  Kept telling us that there was no one there, there was nothing going on.  We asked him if we could come in and check to make sure, just to make sure everybody was okay.  And he again told us that he didn't see a reason for it because there

_____

[6]It would be reasonable for an officer to ask a seven to ten year old child standing in the room if he was ok or if everything was alright or if there was anyone beside him and his father in the house as part of the officer's gathering of information relevant to his determination if any exigent circumstances or emergency existed and as part of his decision whether to go in without a warrant.  It would be particularly reasonable when there is no apparent evidence of a present exigency except for the anonymous and yet unverified 911 call.

was no one there but him and his son." Tr. 43   Bridges confirms Back-up Officer's recollection that he attempted to shut the door.  Tr. 93-94, 108.

43.    Whether Lead Officer had consent to enter the residence or not, he did enter through the door.  Bridges then backed up, complained about his feet being cold, and moved toward the back of the room stating he wanted to get some socks when in fact he testified he had wanted to hide the marijuana from view of the police. Tr. 114.   The officers instructed Bridges to sit on the couch.  When Bridges failed to sit on the couch as directed, he was taken down to the floor by Lead and Back-up Officer.  While on the floor, when he would not move his hands from under him, Bridges was Tasered at least twice by Back-up Officer.[7]  Tr. 46-47, 110-111.

44.    After he was Tasered, Bridges put his hands behind his back and was handcuffed.  Tr 47.

45.    During the take down,  Lead Officer smelled the odor of marijuana on Bridges. Tr. 31.

46.    After Bridges was handcuffed, Lead Officer conducted a sweep of the house or apartment. Tr. 13-17.

47.    During the sweep of the apartment, Lead Officer did not find anyone injured nor did he find any  person in the house or apartment other than Bridges and his son, Jalen. Tr. 15.

48.    During the sweep Lead Officer saw a bag of marijuana in plain view on the floor of the back den near a closet.  Tr. 14-15.

49.    After seeing the bag of marijuana Lead Office met Sgt. Post, also of the Bridgeport Police Department, in the hallway outside the back den (living room).  Lead Officer told Sgt. Post

---

[7]The officers testified Bridges was Tasered two times, and that the other three times the report indicates the  Taser was fired were two test firings and an accidental firing (while the Taser was not in contact with Bridges."  Bridges testified he was Tasered five to six times.

what he had seen in the den (bag of suspected marijuana).  Tr. 16.

50.     Sgt. Post then contacted the Drug Task Force.  Tr. 16.

51.     It was only after speaking to Lead Officer that Sgt. Post looked into the master bedroom, followed by Lead Officer resuming  his sweep of the apartment by entering and looking at the master bedroom.  Tr. 16, 28, 36, 51.

From the evidence, the undersigned finds the following facts to be disputed and relevant to the issues raised by the parties:

1.     After the "third attempt of knocking on the door," the Lead Officer heard a male voice from within the residence say: "Who the f_ _ k is at the door."  Tr. 5, 6.

2.     Bridges denies saying "Who the f _ _ k is at the door," claiming he did not hear police sirens or see police lights and thought the only person who would be at his door was Megan's sister.  Bridges does not deny answering the door.

3.     Lead Officer testified that in response to his second request to come in and look around to make sure no one was hurt, Bridges said,  "Go ahead and check, but [you] won't find anything there.  Tr. 9.

4.     Back-up Officer testified that. after a few times of Lead Officer telling Bridges that he wanted to check inside the residence to see that no one was hurt and Bridges refusing, saying that only he and his son were present,   "... the Defendant then stated 'Go ahead and look, but I told you nothing is going on.' And that's when Officer Williams went through the front door."  Tr. 43.

5.     Bridges admits he told the police that nothing was going on and that Megan had been gone from the residence for some time. Tr. 104.

6.    Bridges testified that Lead Officer asked to enter the residence multiple times telling him "that they have the right to come into the apartment." Tr. 92. He also stated that once Back-up Officer arrived, additional requests to enter his residence were made by each officer. Tr. 93.

7.    Bridges testified that he did not give the police permission to enter his residence. Tr. 93, 94, 104.

8.    Bridges denies telling the police to "go ahead and look around." Tr. 105.

9.    With respect to the police entering his residence, Bridges testified that "[b]asically, they just made their way into the apartment." He said: "Well, the door was open because I was trying to close it and I was telling them, no, they couldn't come into my residence. And I was trying to close it, and they were telling me they had the right to come into the apartment. And I was still telling them, no." He explained he did not just close the door because "I was being respectful and I didn't want no other problems, with them standing outside of the apartment like that." Tr. 93-94. He testified on cross-examination, "I told them no at the front door, that I did not want them to come in. They made their way in. I wasn't going to jump and tackle a police officer. So I was making my way back saying I needed a pair of socks, because I did not want them to go in that backroom." Tr. 105.

10.   Bridges testified he told the police he did not want them in his apartment again after Lead Office came through the doorway "[b]ecause I knew I had something out and I told them from the beginning that I didn't want them in the apartment. And I was walking back to see if I could get to it and put it away so they would never see it. But that didn't happen and just----" Tr. 95-96, 114.

15

### III.  Discussion

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." _United States v. Wilhelm_, 80 F.3d 116 (4ᵗʰ Cir. 1996).  "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." _Payton v. New York_, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting _United States v. United States District Court_, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972).  "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." _Silverman v. United States_, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

It is undisputed that the entry into and initial search of Defendant's residence was without a warrant.  The United States Supreme Court holds:

> It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." _Groh v. Ramirez_, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004)(_quoting Payton v. New York_, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L.Ed.2d 639(1980) (some internal quotation marks omitted)).  Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.  _Flippo v. West Virginia_, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam); _Katz v. United States_, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed. 2d 576 (1967).  We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause. _Michigan v. Tyler_, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to prevent the imminent destruction of evidence, _Ker v. California_, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), or to engage in "hot pursuit" of a fleeing suspect, _United States v. Santana_, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).  "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." _Mincy v. Arizona_, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

_Brigham City, Utah v. Stuart_, 547 U.S. 398, 126 S. Ct. 1943 (2006). The Government argues that

two exceptions to the warrant requirement exist in this case: 1) Defendant consented to the search of his residence, and 2) exigent circumstances obviated the requirement of a search warrant. Defendant argues that he did not consent to the search and no exigent circumstances existed that would permit a warrantless search.

## A. Exigent Circumstances

The Government argues either the "exigent circumstances" doctrine or the "emergency aid" doctrine justified the officers' warrantless entry into Defendant's residence and the brief search. In the recent case of _Brigham City, Utah v. Stuart_, 547 U.S. 398, 126 S.Ct.1943, 164 L.Ed.2d 650 (2006), the United States Supreme Court stated as follows:

> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. " _Id._ at 392, 98 S.Ct. 2408 (quoting _Wayne v. United States,_ 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); see also _Tyler, supra,_ at 509, 98 S.Ct. 1942. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. _Mincey, supra,_ at 392, 98 S.Ct. 2408; see also _Georgia v. Randolph,_ 547 U.S. 103, ----, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur") . . . .

>  . . . . An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed _objectively,_ justify [the] action." _Scott v. United States,_ 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (emphasis added). The officer's subjective motivation is irrelevant. See _Bond v. United States,_ 529 U.S. 334, 338, n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) ("The parties properly agree that the subjective intent of the law determining whether that officer's actions violate the Fourth Amendment ...; the issue is not his state of mind, but the objective effect of his actions"); _Whren v. United States,_ 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); _Graham v. Connor,_ 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("[O]ur prior cases make clear" that "the subjective motivations

of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment") . . . .

Respondents further contend that their conduct was not serious enough to justify the officers' intrusion into the home. They rely on *Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), in which we held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." This contention, too, is misplaced. *Welsh* involved a warrantless entry by officers to arrest a suspect for driving while intoxicated. There, the "only potential emergency" confronting the officers was the need to preserve evidence ( *i.e.,* the suspect's blood-alcohol level)-an exigency that we held insufficient under the circumstances to justify entry into the suspect's home. *Ibid.* Here, the officers were confronted with *ongoing* violence occurring *within* the home. *Welsh* did not address such a situation.

We think the officers' entry here was plainly reasonable under the circumstances. The officers were responding, at 3 o'clock in the morning, to complaints about a loud party. As they approached the house, they could hear from within "an altercation occurring, some kind of a fight." App. 29. "It was loud and it was tumultuous." *Id.,* at 33. The officers heard "thumping and crashing" and people yelling "stop, stop" and "get off me." *Id.,* at 28, 29. As the trial court found, "it was obvious that ... knocking on the front door" would have been futile. *Id.,* at 92. The noise seemed to be coming from the back of the house; after looking in the front window and seeing nothing, the officers proceeded around back to investigate further. They found two juveniles drinking beer in the backyard. From there, they could see that a fracas was taking place inside the kitchen. A juvenile, fists clenched, was being held back by several adults. As the officers watch, he breaks free and strikes one of the adults in the face, sending the adult to the sink spitting blood.

In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone "unconscious" or "semi-conscious" or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.

Applying *Stuart*, *Id.,* at the time of the entry into Bridges/Oliverio home, Lead Officer and his Back-up Officer had to have an objectively reasonable basis for believing that an injured person might need emergency help or to protect an occupant of the home from imminent injury.

18

Upon arrival at the Bridges/Oliverio home, Lead Officer and Back-up Officer had only the knowledge of a dispatch call that notified them "of a possible domestic happening" at 604 Sherwood Forest Drive in Bridgeport, and that the anonymous caller who called 911 had reported that "she could hear what appeared to be arguing between a male and female occurring at that residence." (undisputed findings 4, 5, and 6 herein). Neither of the officers had ever before been called to 604 Sherwood Forest Drive to respond to a domestic complaint. (undisputed finding 7 herein). The officers responded immediately, arriving on the scene within minutes of being called. They did not hear any sound coming from within the apartment or see anything going on within the apartment as they approached the front door. (undisputed findings 8, 11, and 36 herein). Neither of the officers had any direct contact with, nor did they attempt to have contact with the anonymous caller to obtain more information prior to knocking on the front door. (undisputed finding 12 herein). Lead Officer knocked on the front door in series three times and heard and saw nothing from inside the residence between the first and second series of knocks. (undisputed findings 10 and 17 herein). Bridges responded to the third knock at the door. (undisputed findings 15 and 16 herein). After being informed it was the police who were knocking, Bridges opened his door and submitted to the visual search commanded by Lead Officer. No weapons, drugs or contraband were seen and no marks or signs of combat showed on his face or hands. (undisputed finding 18, 19, 20, 21, 23, herein). The officers standing at the doorway which Lead Officer had pushed open could see into the living room and could observe Bridges and his son, Jalen, and the living room area. They saw nothing with respect to the son or the room that suggested a domestic struggle had just taken place or that anyone may be harmed in the residence. (undisputed findings 24, 3, 36, and 38 herein). While at the front door the officers did not hear sounds coming from within the apartment and had

no reason to believe that a misdemeanor or a felony had been committed. Back-up Officer, on cross examination, went so far as to answer the following question: "And there is *nothing about the circumstances* that you find at this location which - - which would give rise to a belief that there was any type of emergency that existed at this - - this residence at this time, correct?" saying: "Other than the 911 call." (undisputed finding 36 herein)(emphasis added by the undersigned). Other than the benign conclusions reached from observing the child, the officers did not glean anything from the presence of the child while they were at the front door because they did not ask him anything. (undisputed finding 39 herein). Lead Officer explained to Bridges while they were at the front door that the police were there because they had received a 911 call of a disturbance, possibly a domestic, a female's voice at Bridges' house. Bridges answered the officers' questions stating there was no problem and there was nothing going on; and there wasn't a female there at the time because she had brought the boy home from school, called her sister and, after about five minutes, left again to go shopping. (undisputed findings 22, 26, 27 and 28 herein). When asked if he could explain the report of yelling, Bridges told the officer that, while he did not recall any yelling, he and his son had been playing video games and he had told his son to clean up his room. (undisputed finding 39 herein).

From the following selections of the officers' words used in their conversations with Bridges at the front door of his residence and in the Court testimony, it appears the police had reservations about the information they had received from dispatch which caused them to respond: received a 911 dispatch call "of a *possible* domestic happening;" the caller stated "she could hear *what appeared to be* arguing between a male and female occurring at that residence;" "there was a disturbance at that location, *possibly* a domestic, a female's voice;" and "other than an argument" as reported to

the 911 dispatcher and in turn reported to him, Lead Officer did not know of anything that had been going on inside the residence.  (undisputed findings 4, 5, 6, and 22 herein)(emphasis added by the undersigned).

While it is not known by the undersigned when it may have dawned on Lead Officer that what the anonymous caller may have heard and reported was Bridges and his son, Jalen getting into the video game they were playing, the following is undisputed: 1) Lead officer was told by Bridges that he and his son were playing video games before the officer entered Bridges' house; 2) the woman of the house was not there and had been away shopping since shortly after she brought Jalen home from school;  and 3) in response to the following question Lead Officer offered the following answer: Q.  "And did it cross you mind that - - that the young child may have a voice similar to that of a female and that may have been what was heard by the 911 caller?  A.  Not at that *specific moment*."  (undisputed findings 39 and 29 herein)(emphasis added by the undersigned).

Moreover, contrary to the type of things within the totality of circumstances that  Back-up Officer testified he was trained to look for, he saw nothing.  He did not see anyone bleeding.  He did not see blood on the floor.  With respect to Bridges' demeanor: he noted there was nothing about Bridges or his son's appearances that indicated  any violence had occurred; he saw nothing in Bridges' eyes indicative of drug influence; he saw no tears in Bridges' eyes; Bridges was not observed to be breathing hard;  and Back-up officer did not consider it strange or unusual that a person would be upset at the police being at the front door. (undisputed finding 36 herein).  In short, Back-up Officer saw  "nothing about the circumstances that [he found] at [the] location which - - which would give rise to a belief that there was any type of emergency that existed at this - - this residence at [the] time" other than the 911 call. (undisputed finding 36 herein).

The police observed no exigency in the situation at the Bridges/Oliverio residence prior to police entry or in the information provided by the anonymous caller, whether considered separately or in combination (totality) that made the needs of law enforcement so compelling that a warrantless search of the residence was objectively reasonable under the Fourth Amendment. *Mincy v. Arizona*, *supra* at 393-394.

Under such circumstances and absent consent to search, Back-up Officer knew from his training that he was to be persistent in trying to gain consent to search; he was not to barge in someone's house without a warrant or consent; because "if there is a domestic there, if - - if he knows I'm outside or the individual knows I'm outside, they're not going to continue with what was going on. If they do, then I'll hear something which gives me the reason to go through the front door." (undisputed findings 33 and 40 herein).

Why Lead Officer, who had also received his training from the West Virginia State Police Academy, believed he had the right to barge through someone's door without a warrant or consent, is unknown by the undersigned. However, it is clear from the evidence that Lead Officer had the opinion and expressed the opinion that he had the right to enter Bridges' house without consent and without a warrant simply because he was responding to the anonymous call reporting a possible domestic situation. (undisputed findings31, 39, 13 and 14 herein).

The United States cites *United States v. Gwinn*, 46 F.Supp.2d 479 (S.D.W.Va. 1999)*, aff'd*, 219 F.3d 326 (4th Cir. 2000) in support of its contention that "Defendant Bridges' consent was not necessary" because "the investigating officers properly entered Mr. Gwinn's home out of a concern for possible victims in need of immediate aid" and "[the troopers'] initial entry into the trailer following Gwinn's arrest and their protective sweep of the trailer comported with established

principles of Fourth Amendment American jurisprudence."  DE 29, p. 2 and 10.  What the <u>*Guinn*</u>

Court and the officers involved in that sweep search had which Lead Officer and Back-up Officer

in this case failed to have in the entry and search of the Bridges/Oliverio home was "articulable facts

which, taken together with the rational inferences from those facts, would warrant a reasonably

prudent officer in believing that the area to be swept harbors an individual posing a danger to those

on the arrest scene." <u>*United States v. Gwinn*</u>, 46 F.Supp.2d 479, 482-483 (S.D.W.Va. 1999), *aff'd*,

219 F.3d 326 (4th Cir. 2000)  citing <u>*Maryland v. Buie*</u>, 494 U.S. 325 , 334 (1990) and DE 29, P. 9-10.

The officers in the <u>*Guinn*</u> case were armed with the following pertinent facts: 1) a specific and

detailed non-anonymous 911 call[8]; 2) when the officers arrived on the scene, they called for Guinn

to come out, Guinn  approached the police without shoes and a shirt;  he was taken into custody;

the officers could smell alcohol all over him; and 3) when the officer went to the trailer he could see

through the closed screen door and observed  Dianne Harrah and her baby sitting on the couch in

the front room crying. The police entered the trailer without permission to render aid and to try to

calm the mother and child.  <u>*Id*</u>. at 482.  District Judge Chambers reasoned: "At the time of his entry

into Mr. Gwinn's home, Trooper Thomas saw a crying woman with a crying baby in her arms and

knew that he had been sent to the residence because of a report that an individual named Dennis

Gwinn was threatening to kill his wife or girlfriend.  From the evidence, the Court concludes that

Trooper Thomas and Sergeant Moore reasonably entered Mr. Gwinn's home to see if Ms. Harrah,

the baby, or anyone else might be in need of immediate aid."  Unlike <u>*Gwinn*</u>, in the instant case the

---

[8]The 911 caller in <u>*Guinn*</u> identified herself as Anna Terry, the mother of Dianne Harrah.
Ms. Terry told the 911 dispatcher that "[M]y daughter is living up there with a guy named
Dennis Gwinn, and she just called me real fast and told me to call the police... And she told me
that he's got a gun in there by the door and he told her he was going to kill her."  Ms. Terry also
told the  911 dispatcher that her daughter had a baby with her.

911 caller was anonymous, and the 911 call provided little detail and was characterized as a "possible domestic" On arrival the police noticed: nothing unusual about Bridges[9]; the young child was not in any apparent distress; no fighting or evidence of a recent fight or altercation outside the residence; no fighting or evidence of a recent fight or altercation inside the foyer and living room areas of the residence; no observations of anyone else besides the child and Bridges in the foyer and living room areas of the residence; and no sounds from anyone else besides Bridges in the residence.

The undersigned is not unmindful of the need for police to seriously respond to reported domestic conflict situations and, in doing so, that they be accorded some latitude in making on the spot judgments as to what actions to take and what actions are reasonably necessary to protect themselves and potential victims of abuse; but the question initially presented by this case is: Should the police be entitled to enter a person's home without a warrant in the absence of anything other than the bare assertions made by the anonymous caller to 911? In short: Do "domestic abuse cases create a presumptive exigent need for warrantless entry?" _United States v. Brooks_, 367 F.3d 1128, 1136 (2004).

A rule that domestic abuse cases create a presumptive exigent need for warrantless entry opens the gates to police officer's unwitting entry at the behest of the mistaken or disgruntled neighbor.[10] Such a presumption shifts the burden of proof to the homeowner to establish that no

---

[9]As previously noted, Back-up Officer did notice an odor of marijuana but he did not impart this information to Lead Officer before entry and it was only after entry and the take down of Bridges that Lead Officer made his own observation of the odor of burnt marijuana on Bridges.

[10]A neighbor could be legitimately mistaken at loud noises coming from a family playing a video game or watching an action or horror movie. A neighbor could also, however, have a

domestic violence had occurred in order to prevent access by the police. Such a *per se* rule eliminates the need for the police to take into account the totality of circumstances in making an objective decision whether to enter a residence without a warrant or not. In the instant case, Bridges was put in the untenable position of trying to convince the police that nothing had happened and nothing was going on. It was all to no avail. For Lead Officer, nothing Bridges said or did and nothing Lead Officer saw outside or in the area of the inside of the house he could see from the open door was going to make a difference. He believed he had a right to go in and he was going in. Tr. 34. For Back-up Officer, the only way he was going to be convinced that there was no one in the house that was injured was by confirming that by going into the residence. Tr. 59.

Under the circumstances facing the Bridgeport Police on October 30, 2007, they had an alternative. That alternative was known to Back-up Officer because of his training at the State Police Academy. They could have waited and observed and if something occurred that gave them probable cause, they could have gone in. If nothing occurred that gave them probable cause to enter without a warrant, they could have respected Bridges' rights under the Fourth Amendment and stayed out. By not taking the reasonable alternative clearly outlined in the following cases and in Back-up Officer's training, they risked the loss of evidence they found inside the house.

In <u>United States v. Black</u>, 482 F.3d 1035 (9th Cir. 2007) the police entered Black's apartment because: 1) Black's ex-girlfriend called 911 and reported that Black had beat her up that morning in the apartment and had a gun. 2) She further told the dispatcher that she intended to go back to

---

nefarious reason for calling in the police such as: some ethnic or racial bias against the unsuspecting neighbors or irritation at the volume at which the neighbor played music or the television. The neighbor may also be disgruntled over the neighbors' living arrangements (unmarried couples, mixed racial or ethnic or religious relationships, gay or lesbian couples) or a whole host of other perceived affronts to that person's view of correct social order.

the apartment with her mother in order to get her personal belongings, would wait outside for a white Ford truck to arrive, and that the police should come.  3) When the police arrived, there were no signs of the ex-girlfriend or her mother or the Ford truck.  3) A check of the grocery store from which the ex-girlfriend had placed the 911call revealed she was not there. 4) After knocking on the door and getting no response and not being able to locate the apartment manager to get in, the police located someone fitting Black's description behind the apartment and questioned him.  5) Black admitted who he was and that he knew the police were there in response to a domestic violence call. 6) Black denied he lived in the apartment. 7) Black became agitated and was searched with consent. 8) The search revealed an apartment key.  9) The police used the key to sweep search the apartment to see if anyone was there and in the process saw a gun on the bed.  Upholding the sweep search and later warranted search and admission of the firearm seized as a result, the Court on the above facts reasoned:

> [T]he combination of these circumstances support an objectively reasonable belief that Walker could be in the apartment.
>
> This is a case where the police would be harshly criticized had they not investigated and Walker was in fact in the apartment. Erring on the side of caution is exactly what we expect of conscientious police officers. This is a "welfare search" where rescue is the objective, rather than a search for crime. We should not second-guess the officers' objectively reasonable decision in such a case.
>
> Our circuit has recognized that "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy."*United States v. Brooks,* 367 F.3d 1128, 1136 (2004). While we have stopped short of holding that "domestic abuse cases create a per se exigent need for warrantless entry," we continue to evaluate, on a case-by-case basis, whether the "total circumstances, presented to the law officer before a search ... relieved the officer of the customary need for a prior warrant."

In *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005) the Court of Appeals, applying the domestic disturbance prong of the emergency exception to the warrant requirement of the Fourth

Amendment, affirmed the lower court's denial of Defendant's motion to suppress firearms seized during the warrantless search of his residence,   relying on the following facts known by the officer responding to a domestic call:

> In the summer of 2002 in Nampa, Idaho, police officer Mike Phillips was dispatched to the residence of Lisa and Monroe Martinez in response to a domestic violence call. The initial radio transmission received by Phillips indicated that there was an "out of control" male and that the 911 call was disconnected. Phillips recognized the address as a residence he had been called to on a previous occasion for a domestic violence incident. Phillips recalled that on the previous occasion the female had a "fat lip" because "the male subject had hit her."

> Upon arriving on the scene Phillips saw Lisa Martinez in the front yard. Lisa was "very upset, crying, she had her face in her hands." Lisa did not say anything that indicated she had been physically injured, and Phillips did not observe evidence of physical injuries.

> While attempting to speak with Lisa, Phillips could hear yelling coming from inside the house. Phillips "could not make out" precisely what was being said but he described it as "angry, hostile yelling." Phillips entered the house in order to make sure that the person yelling was not injured, that someone else in the house was not being injured, and to make sure the individual yelling was not going to come out of the house with weapons. One of the possible scenarios that occurred to Phillips was that "Mr. Martinez had a knife stuck in his chest and he was yelling because he was mad [that] he had been stabbed."

> As Phillips entered the house he saw a young boy standing in the doorway. He asked the boy if the doorway would lead him to the yelling man, and the boy responded affirmatively. Phillips followed the yelling through a laundry room and hallway to a bedroom where he observed Martinez kneeling on the floor and reaching under the bed. Martinez was yelling "he was going down for this."

> Phillips was afraid that Martinez was searching for a weapon under the bed. Phillips told Martinez to move into the living room "where we could figure out what was going on." At this point, Phillips did not regard Martinez as a criminal suspect. Upon entering the living room, Phillips noticed two rifles and a shortened barrel shotgun resting on the couch. *Id*. at 1162-1163.

In United States v. Moss, 963 F.2d 673 (4th Cir. 1992), the Fourth Circuit Court of Appeals concluded on the facts before it, that a forest service officer who entered  through the closed but

unlocked door of a forest service cabin rented to Moss and another young man, did not have an objectively reasonable belief that an emergency required his entry into and search of the cabin, overturning the lower court's denial of Moss' motion to suppress the marijuana found and seized during the search.   The pertinent facts known to the officer prior to entry were: 1) the officer saw Moss' car illegally parked blocking a forest service road;  2) the officer called a clerk of the office to see if the Swan cabin was rented and was mistakenly told that it was not; 3) the officer went to the Swan cabin looking for the owner of the illegally parked car;  4) the officer saw fresh bicycle tracks outside of the cabin somewhat assuaging his concern for the safety of the car owner; 5) the officer decided to enter the unlock but closed door to the cabin, and 6) when he entered the cabin, he found and seized marijuana**.**   The _Moss_ court held:

> To invoke this so-called 'emergency doctrine,' the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.

In _United States v. Curzi_, 867 F.2d 36 (1ˢᵗ Cir. 1989)[11] the First Circuit held that an arrest warrant for a third party was insufficient to justify the FBI agents' warrantless order that the occupants vacate a residence and subsequent security sweep of the residence, finding that no exigent circumstances justified the agents' actions; and suppressed evidence seized during the search.

In _United States v. Brooks_**,** 367 F.3d 1128 (9ᵗʰ Cir. 2004) the Ninth Circuit affirmed the lower court's denial of a suppression motion resulting from police entry into a motel room in response to a 911 call made by the guest in an adjoining room reporting what she thought were the sounds of

---

[11]Cited by the United States in the instant case to support the conclusion that "[t]hese decisions comport with rulings in other jurisdictions that 'exigent circumstances' are created by an officer's reasonable belief that the delay needed to obtain a warrant would pose 'a threat to police or the public safety.'"   DE 29, p. 11.

a woman being beaten. Again the facts supporting the objectively reasonable basis for entry by the police are starkly different from the facts of the subject case. First and foremost, the police met with the 911 caller in the motel lobby before going to the scene of the reported domestic violence. Second, on arrival at the scene, the Defendant stated "I knew you were coming. She was very loud." Third, the officer saw through the open doorway that the room was in "total disarray," the bed being unmade and clothes being strewn all over the floor. Finally, when the officer asked if there was a woman in the room and could he speak with her, the Defendant told him she was in the bathroom taking a shower and turned to ask the woman to come out, leaving the door open. The officer entered and while standing there noticed the woman in the kitchen area crying. While the officer was talking to the woman and Brooks, Brooks told the officer there was some marijuana in a drawer and both he and the woman consented to the Officer searching. Evidence pertaining to a bank robbery was discovered during the search which was the subject of the suppression motion. The Court concluded that the following facts known to the officer justified his entry through the open door of the motel room:

> Perez had been alerted to the possibility that a woman in Brooks's room was being beaten, a serious danger; the hotel guest staying in the adjacent room had perceived an emergency and called 911 because she was alarmed by what she had overheard. When Perez arrived at the hotel, he spoke with this concerned guest in the lobby, and had the opportunity to assess her credibility. When Perez knocked on Brooks's hotel room door, the tale told by the guest was, to a degree, corroborated. Perez heard Brooks say, "Honey, I think somebody is here," likely indicating to Perez that a woman was inside. When Brooks opened the door, Perez did not see a woman, but Brooks told Perez, "I knew you were coming. She was very loud." Brooks thereby confirmed to Perez both that a woman was present, and that there had been, at the least, a loud argument.

The court further concluded that while the officer (Perez) could not be certain that the woman had been beaten, probable cause does not require such certainty. It only requires "a fair

probability or a substantial chance that criminal activity took place. The court concluded further "that Perez had cause to know that Brooks and Bengis had argued and in the total circumstances there was a 'fair probability or substantial chance' that an assault had occurred. It is of no moment that Perez later found no definite evidence of physical abuse, and that Bengis disclaimed injury. Before Perez walked into the hotel room, the expressed concerns of the guest next door, corroborated by Brooks' statements and the facts observed by Perez, gave probable cause for his entry." _Id._ at 1134.

The undersigned reviewed _United States v. Lawrence_, 236 F.Supp.2d 953 (D.Neb. 2002) and finds that in that case the police gathered a large amount of facts outside of the residence (loud shouting and cursing coming from inside the house, heard and saw a woman crying at an open door of the house which was then closed at the defendant's demand) over a considerable period of time (a time which included calls to dispatch to call the probable victim and at least one call to a police supervisor) which, in combination with the disconnected 911 call, would have supported entry but for the fact that consent was clearly and unequivocally given by the defendant for two police officers to enter during which they saw two rifles possessed by a person they knew to be a prior convicted drug felon.

The undersigned reviewed _United States v. Warden_, 886 F.Supp. 813 (D.Kan. 1955) and concludes therefrom that the police in that case were invited into the residence by a juvenile living in the home who had placed the 911 call reporting that he mother was being beaten by her husband.

The undersigned reviewed _United States v. Guarente_, 810 F.Supp 350 (D.Me., 1993) and concludes that the police, responding to a 911 call of a domestic dispute involving a gun, on arrival, observed a man in a side open doorway yelling, "He's got a gun. He's got a gun." The police

observed two other men come to the doorway. They were patted down by police, separated and secured. The men continued to threaten each other. The police also learned a woman was behind the door and her two grandchildren were in the upstairs of the house. Armed with this information the officer entered the house in which he located a firearm in plain view.

The undersigned also reviewed _United States v. Davis_, 290 F.3d 1239 (10th Cir. 2002), in which the Tenth Circuit affirmed the District Judge's suppression of crack cocaine and three firearms seized by police. The police received a report of "a possible domestic disturbance" shortly before 5:30 am. The police knew the house to be the residence of Davis and Coleman. They also knew Davis over "minor, non-violent circumstances" and knew that he was not wanted on any criminal charges. The first officer arriving on the scene heard no noise and saw no evidence of a disturbance. Davis appeared at the front door in boxer shorts smelling of alcohol and having bloodshot eyes. He told the police he had been disciplining his child in explanation for the noise. He told the police Coleman was in Topeka. However, she appeared from inside the residence. She told the police she and Davis had been arguing. Davis impeded the police in their effort to talk to Coleman, shielding her scantily clad body from the police. The police told Davis to step outside and Coleman resisted Davis' attempt to close the door. Davis refused entry into his home. The police told him they were coming in anyway to check on Coleman. Davis opened the door and told Coleman to go outside. Davis went inside the house and two police officers followed. No one consented to the police entry into the home. The Tenth Circuit recognized that "[p]robable cause accompanied by exigent circumstances will excuse the absence of a warrant." _Id._ at 1242. It also recognized that "[t]he basic aspects of the 'exigent circumstances' exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect

their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched." *Id.* at 1242. The court, under the facts of the case, rejected the government's argument that a special rule for domestic calls was required because they are inherently violent. *Id.* at 1244.

The undersigned searched and has been unable to locate any case that provides for *per se* or presumptive exigent need for warrantless entry based solely on an anonymous 911 call reporting a possible domestic situation. The undersigned has reviewed the facts that Lead Officer had at the time of the warrantless entry into the Bridges/Oliverio residence and can find no emergency or exigency that existed to support the entry when those facts are viewed from the reasonable objective police officer standpoint. The undersigned has not found any Fourth Circuit case which creates a special rule for domestic calls standing alone and without more from the scene. Even if there was, there is nothing about the actions of Bridges at the front door which would have been a cause for the officers to have concern for their safety. Neither was there anything that corroborated the anonymous 911 call.[12]

---

[12]The West Virginia Supreme Court of Appeals in a *per curiam* decision: *State v. Bookheimer*, Nos 33289, 33290 (November 8, 2007) reversed the trial court's denial of defendants' motion to suppress and remanded the case for trial concluding: "[w]e find it unreasonable for the officers to have conducted a warrantless entry and search. At the suppression hearing, the responding officers testified that Ms. Tingler clearly told them that there was no domestic dispute, they were not wanted, they were not needed, and that she wanted them to leave. In the face of this clear rebuke, it would not be reasonable for an officer to proceed to enter and search the premises unless there was some other condition lending to an emergency circumstance." The case like the Bridges' case was initiated by an anonymous 911 call advising of a domestic dispute. The 911 caller in Tingler advised hearing screaming and yelling and gunshots. When the two officers arrived Ms. Tingler was hysterical yelling and screaming. Her anger and yelling at that point was directed at the police presence on her property. The Court found her behavior did not create an emergency or an exigent circumstance justifying police

Accordingly, absent consent, the undersigned concludes on the totality of the facts of this case that the United States has failed to carry its burden of proving that exigent circumstances existed or that an emergency existed which justified the warrantless police entry into Bridges' home on the date in question.

## B. Consent

A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Whether consent to search was given is a factual issue to be determined by this Court in light of all the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). *United States v. Vickers*, 387 F.2d 703 (4th Cir. 1967) citing *Channel v. United States*, 285 F.2d 217 (4th Cir. 1960), *United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992). That factual determination will not be disturbed unless it is clearly erroneous. *United States v. Gordon*, 895 F.2d 923, 938 (4th Cir). The government bears the burden of proving consent was given for the search. *United States v. Vickers, supra*, citing *Wren v. United States*, 352 F.2d 617 (10th Cir. 1965).

The Court must determine any challenge to consent, based upon the "totality of the circumstances." Where appropriate, the Court must also determine whether consent was knowing and voluntary. The burden is on the Government to prove consent by a preponderance of the evidence. See, e.g., *United States v. Mendenhall*, 446 U.S. 544 (1980) *United States v. Boone*, 245

---

entrance into her mobile home where they located a clandestine meth lab.

While *Tingler is* not authoritative with respect to the case pending before the undersigned, it presented a more egregious set of facts to the responding local police than were presented to the local police responding to the Bridges/Oliverio home.

F.3d 352 (4th Cir. 2001); *United States v. Brugal*, 209 F.3d 353 (4th Cir. 2000); *United States v. Elie*, 111 F.3d 1135 (4th Cir. 1997); and *United States v. Lattimore*, 87 F.3d 647 (4th Cir. 1996).

The factors to be considered in determining whether . . . consent to search was freely and voluntarily given" are outlined in *Elie, supra*:

> [I]t is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter.

111F.3d at 1144.

 "*Written* consent supports a finding that consent was voluntary." <u>Boone</u>, 245 F.3d at 662 (emphasis added), <u>citing</u> *United States v. Navarro*, 90 F.3d 1245 (7th Cir. 1996).

Notwithstanding that consent must be knowing and voluntary, the Government does not have a burden to show that an individual was told or otherwise knew he had the right to refuse consent. <u>See</u>, <u>e.g.</u>, *Ohio v. Robinette*, 519 U.S. 33.   Not even  "the drawing of a gun by an arresting officer" or "the handcuffing of the accused establishes involuntariness in and of itself." <u>Elie</u>, <u>supra</u> at 1145-1146.

However, consent must be more than mere acquiescence to apparently lawful authority.  <u>See</u> *Bumper v. North Carolina*, 391 U.S. 543 (1968)(no consent to search if only acquiescence to apparently lawful authority); *Lattimore*, 87 F.3d at 652 (but for defendant's prior consent to search, state trooper's unfounded threat to call a drug dog . . .  raise[s] serious questions concerning the voluntariness of his consent"); <u>but</u> <u>see</u> *United States v. Smith*, 30 F.3d 568 (4th Cir. 1994) (unlocking car door and appearing cooperative with police sufficient evidence of consent, rejecting defendant's argument that cooperation was motivated by fear of police).

Even if a Defendant has validly consented to a search at one point, he may subsequently

withdraw it.  See *3 W. LaFave, Search and Seizure* §8.2(f) at 674 (3d ed. 1996)("a consent to search is not irrevocable, and if a person effectively revokes . . . consent prior to the time the search is completed, then the police may not thereafter search in reliance upon the earlier consent." and *United States v. McFarley*, 991 F.2nd 1188 (4th Cir. 1993).  But cf. *Lattimore*, 87 F.3d at 651-652 (hesitation or even refusal to sign written consent form "does not act as effective withdrawal of the prior oral consent."

In this case the issue is simply: "Was consent given?"

Two officers testified Bridges gave his consent.  Bridges testified he did not give the officers consent.  The United States has the burden of proof by a preponderance of the evidence since any warrantless search of a person's home is "presumptively unreasonable.  *Groh v. Ramirez, supra, United States v. Vickers,* 387 F.2d 703 (4th Cir. 1967).

In determining the weight and credibility to be accorded the evidence, the undersigned is entitled to and did consider:  each witness' intelligence, motive, state of mind, and demeanor and manner while on the stand;  any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the outcome; the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case;  the  inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses;  that two or more persons witnessing an incident or a transaction may see or hear it differently or have an innocent mis- recollection or  like failure of recollection and  consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood; whether a witness previously made statements which are inconsistent with his or her present testimony; and whether a witness has been shown to have knowingly testified

falsely concerning any material matter, or conducted himself or herself in a manner that indicates a propensity to lie, or involves some element of deceit or untruthfulness. In the process, the undersigned did not treat the testimony of the law enforcement officers who testified differently than other witnesses but instead subjected their testimony and evidence to the same scrutiny and the same tests as applied to the testimony and evidence of any other witness, including but not limited to their demeanor on the stand, their manner of testifying, the substance of their testimony. The undersigned did not necessarily determine the weight of the evidence by the number of witnesses testifying. Instead, the undersigned considered all the facts and circumstances in evidence to determine which of the witnesses were worthy of greater credence or believability.

Applying the above and the principles of *Elie*, *supra*, the undersigned conducts the analysis as to whether the United States has carried its burden of proving by a preponderance of all the evidence that a consent to search was given by Bridges and, if so, was it given freely and voluntarily.

### Characteristics Of The Accused

At the time he was confronted by the police, Bridges appeared to them to be a neatly dressed, respectful adult male. Tr. 6, 90, 93, 94, 22, 23, 42 and 67 (undisputed findings 36, 19, 20, 18 and 21). He appeared to be "upset," and/or "angry" that the police were at his front door. He did not have an "expression in his eyes" that Back-up Officer considered "as being drug induced," even though Back-up Officer smelled the odor of burnt marijuana about Bridges' person while standing at the front door. In fact, Back-up Officer testified he saw nothing unusual in Bridges' anger at the police presence. Tr. 6, 67-68 and 63 (undisputed finding 36).

Moreover, the police had not ever been to the residence before and they had not had a prior complaint involving Bridges. During the hearing, no one offered any evidence that Bridges had a prior criminal record which impacted the credibility of his testimony under the rules of evidence, notwithstanding that Bridges waived his right to remain silent, took the stand, and was examined and cross-examined under oath. (undisputed finding 7).

During that cross-examination the United States inquired concerning the absence of a receipt for the groceries or other things Bridges and Megan Oliverio said she bought while away from the home. This cross-examination appears primarily designed to impeach the credibility of the testimony of Bridges with respect to Oliverio being absent and that no domestic had occurred between them. From the cross- examination it became apparent that Bridges and Oliverio did not have any receipts, cancelled checks, or other documentary evidence of Megan Oliverio's purchases. However, the absence of the receipts does not impugn Bridges' testimony that Megan Oliverio was not present at the residence for some time prior to the arrival of the police. That was verified by her later arrival and confrontation by the police in her own home and her inquiry of the police as to what was going on. While Bridges became somewhat frustrated by the repetitive questions and accusatory and badgering nature and tone of the questions being asked, the following is an example of the way Bridges responded: "Matter of fact, I don't know what happened to the receipt. But she came in the apartment with grocery bags, and she asked the officers could she take her groceries that she bought because she was going to go stay at her mother's that night." Tr. 97. The undersigned concludes that the non-production of receipts was a non-issue for purposes of the suppression hearing. Tr. 96-99.

With respect to whether Bridges used "f_ _ k" in response to the third series of knocks at his

door or whether he used "s_ _ t" while playing a game with his son or whether he was a person given to using profanity, it is not a matter of importance.  It would not be unusual for a person who unexpectedly hears someone knocking on his door after or at dark to call out before opening the door.  Some may even use an epithet.  It would also not be unusual for them to not remember saying it months later.  The undersigned could easily conclude that Bridges said exactly what the officer testified he said and that Bridges does not now remember saying it.  Whether Bridges said the word or not is irrelevant.  He did answer the door and ultimately open the door.  What he said in the doing of that did not impact the officers in their decision to stay at his door and ultimately enter his residence.

With respect to his use of the word "s_ _ t," Bridges admitted using the word in the context of playing a video game with his son. Tr. 102.  The undersigned concluded at the hearing and, since the hearing, has again considered and concluded  that the use of the word was and is not relevant particularly since the police did hear not  it and therefore could  not considered it in making their decision to stay and enter the home.   Tr. Tr. 99-104.   The undersigned disagrees with the Government's assertion regarding the  relevance of Bridge's use of the word "s–t":

> Well, Your Honor, if he's a person who uses this type of language on a - - on a basis that it would be overheard by his neighbors, it lends credibility to the officer's statements that when he responded to the door, that he used that type of language in a - - a loud manner before the opening the door to them.  And it goes to his demeanor and to the probable cause of them getting inside the residence.

Tr. 101.

The undersigned further concludes from Bridges' cross-examination testimony that he was unaware  there was a knife of some sort on the mantle in the back den.  The testimony does establish that Bridges could have reached the knife because he was tall enough to reach the mantle.  Again,

that fact, even if true, is irrelevant because the police did not enter Bridges' home because they suspected he had a knife on the mantle in the back den. They did not know about the knife until they searched sometime after Bridges had been taken down, Tasered, and secured. They could not see it from the front door because of intervening walls. Moreover, they had already done a visual search of Bridges' person and found no weapons.

The remainder of the twenty-five pages of cross-examination are typical question and answer, sparring between counsel, and shed little light on the credibility of the witness with respect to the police entry into his home. That subject was covered on page 112 of the transcript.

## Conduct Of The Accused

One thrust of the Government's cross-examinations of Bridges and Oliverio was to imply that Oliverio had been in the home and that an argument had actually occurred between her and Bridges that was overheard by the 911 caller thereby attempting to impugn the testimony of Bridges to the contrary. A review of that argument in light of the actual evidence enhances the credibility of Bridges with respect to his version of the events rather than impugning it.

Pertinent to this analysis is the following time line taken from the Harrison/Taylor County 911 CAD Incident Report (Government Exhibit 3 and Tr 80-83):

911 call placed by anonymous caller 5:47:08 pm

| | | |
|---|---|---|
| Back-up Officer dispatched | 5:49:00 pm | approximately 2 minutes elapsed time |
| Lead Officer dispatched | 5:50:00 pm | approximately 3 minutes elapsed time |
| Back-up Officer arrives on scene | 5:52:00 pm[13] | approximately 5 minutes elapsed time |

---

[13]Back-up Officer never explained how it could be that he was dispatched to and arrived at the Bridges/Oliverio residence before the Lead Officer according to the CAD record (Government Exhibit 2) and yet he testified when he arrived at the house the Lead Officer was

|                              |            | only 3 minutes elapsed since dispatch |
|------------------------------|------------|----------------------------------------|
| Lead Office arrives on scene | 5:53:00 pm | approximately 6 minutes elapsed time   |
|                              |            | only 3 minutes elapsed since dispatch  |
|                              |            | Tr. 80.                                |
| Bridges in custody           | 5:59:29 pm | approximately 6 and ½ minutes after    |
|                              |            | Lead Officer arrives on the scene and  |
|                              |            | 12 minutes 21 seconds after 911 call   |
|                              |            | placed and                             |

The undersigned finds that in the few minutes (5-7) that elapsed between the 911 call and Bridges' appearing at his door, it would be nearly impossible for Bridges to have concocted the story he related to the police, which was corroborated by Oliverio. First, there is no evidence that Bridges knew an anonymous person had placed a call to the police complaining about a possible domestic situation. Second, as soon as he opened the door part way, Lead Officer pushed the door open wider and told him to put his hands up, lift his shirt up some and turn around in a weapons check. Tr. 21, 6-7. Third, as soon as the weapons check revealed no weapons, Lead Officer explained his reason for being there. Bridges' immediate response to the officer's questions was that nothing was going on; he and his son were playing video games; he had asked his son to clean his room; there was no female there; and, although a female lived there with him, she had not been there for some time. Tr. 8-9, 23-24, 43. Fourth, the police were each able to see Bridges and his son through the open doorway. They had not heard or seen anything outside of the residence or through the windows of the residence or, after the door to the residence had been opened, through that open door, that would

already at the front door. Tr. 42-43.

indicate to them a woman was present in the residence.  Fifth, after Bridges had been Tasered, secured, sent to the hospital for medical treatment and while the police had the residence secured waiting for a state search warrant, the police saw Megan Oliverio walking in the house.  Since they had done at least two sweeps of the residence, one of which was prior to removal of Bridges, they knew no woman was in the residence.  Upon seeing Oliverio in the residence, they confronted her, found out that she had entered through the garage, and escorted her out the way she had come in. Tr. 127-129,52-53, 75-76.  Sixth, there is no evidence that Bridges communicated with Oliverio between the time of the police arrival and when Oliverio was confronted by the police, in order for her to corroborate his story.

The undersigned finds there was simply not time for Bridges to have concocted the story that Oliverio had been out of the house, and communicated that story to her so she could corroborate it, between the 911 call and his relating that story to the officers at his front door..

Bridges' conduct at his front door is consistent with his testimony that he  refused to admit the police to his residence.  Bridges called out to the at-the-time unknown person knocking on his door without first opening it.  Once the police identified themselves and ordered him to open the door, he only opened it part way.  Lead Officer then admittedly pushed it open further so he could see all of Bridges.  When Lead Officer asked if he could come in Bridges refused and started to close his door. Tr. 58, 60.  Even after he left the door open at the insistence of the officers, Bridges kept telling the police that nothing was going on and that he did not see any reason for the police to come in because there was no one there but he and his son.  Tr. 43, 58.  Bridges' conduct inside his residence before and after entry of the police is consistent with his testimony regarding his reasoning for telling the police he did not want them to come in.  Bridges knew he had an open bag of

marijuana in the back den that he did not want the police to see.  When police entered his residence Bridges immediately started being non-compliant by backing toward the back den and by refusing their order to sit on the couch in the living room.

Up to that point he had been compliant.  In fact, he had been so compliant that Back-up Officer could not understand his sudden non-compliance.  Tr. 61-62.   At that point the officers could not know what Bridges knew: That his open and obvious stash of marijuana was in danger of being discovered.  It would be reasonable to assume that had Bridges known of the anonymous call and the possibility of the police coming, not only would he have gotten Oliverio out of the house but he would have hidden the bag of marijuana.   The evidence is inconsistent with such a conclusion.

### Conduct Of The Officers

There were two uniformed officers present at Bridges' front door.   They presented themselves as persons with authority.

Lead Officer arrived with the pre-conceived belief that he was authorized to enter Bridges' residence to make sure no one inside was injured,  solely because he was responding to a possible domestic situation.   He did not need a warrant.   He did not need to hear or see anything that heightened his suspicions.  He did not need Bridges' consent.  Lead Officer told Bridges he did not need his consent to enter.  In fact, when asked if he relied on Bridges' alleged consent or on the fact that he was responding to a domestic call in making the decision to go in he testified: A.  Relying on the fact that it was a domestic in nature, and a safety check would be done of the residence. Q. So whether Mr. Bridges consented or not, you were going in?  A. To check the welfare, yes.   Tr. 34, L. 1-8.

Lead officer and Back-up Officer each told Bridges they were not going to leave until he let them in to look. Tr. 58-60. Back-up Officer indicated he had been trained to be persistent and to use his authority and presence to get consent to enter and to not take no for an answer. Tr. 58-60. Nothing that he observed or heard, or did not see or hear, or was told by Bridges or his son, if asked, was going to dissuade him from gaining entry into the residence to conduct the welfare check. Tr. 59.

Back-up Officer prepared the criminal complaint in this matter. In doing so, he averred to the State Magistrate in words to the effect that "due to the 911 call and *the yelling he and the other officer had heard*, we asked the male if we could come in." Tr. 57. He acknowledged at the hearing that was a "misstatement of fact." Tr. 57. Where he averred that ***"Officer Williams stated, he could hear yelling coming from inside the residence***," he acknowledged during the hearing that this was a misstatement of fact in the criminal complaint. (emphasis added) Tr. 57. Back-up Officer explained these misstatements in the criminal complaint as: "I had very limited time to type it, and I was just running through everything in my mind as fast as I could to get it typed." Tr. 57.

First, assuming the CAD Report (Government Exhibit 2) is accurate, Back-up Officer, being the first on the scene and knowing that he did not hear any yelling coming from the residence, would have known that Lead Officer could not have heard yelling, since Lead Officer arrived a minute later than Back-up Officer. It could be surmised that the in-court testimony of Back-up Officer is the accurate version of the timetable for arrival and not the CAD. However, based on the evidence before the Court, the two versions are unreconciled.

Second, it is clear from the evidence that Bridges had been Tasered, secured, and transported to the hospital for treatment of injury to his shoulder which occurred during the takedown. It is also

clear from the evidence that the sweep had been conducted, no injured persons were found, and the police were on the scene guarding the house and the integrity of the evidence in the house. So what was the rush that caused Back-up Officer to mistakenly state in the criminal complaint that there was yelling coming from within the residence when the officers arrived? Back-up Officer only explains he was in a rush and he did not talk to the Lead Officer about what he heard or did not hear from the residence.

The undersigned considers and concludes that these constitute unintentional misstatements of fact by Back-up Officer. However, they do point out the confusion of the officer over the events that had just transpired, that he had just been a part of, and his misinterpretation of what he saw, heard and did not hear all at a time when they would have been most fresh in his memory.

### *Time Of The Encounter And The Duration*

The events in question occurred on October 30, 2007, the day before Halloween. They transpired between 5:53 and 5:59:29, a period of less than 6.5 minutes. Based on the evidence of record, in that less than 6.5 minute time span:

1) Lead Officer had to exit his cruiser and walk or run from his cruiser to the residence;

2) Lead Officer knocked on the door once and got no response;

3) Lead Officer knocked on the door a second time and got no response;

4) Lead Officer knocked on the door a third time and heard Bridges respond from other side of door;

5) Lead Officer directed Bridges to open the door;

6) Bridges opened the door part way;

7) Lead Officer pushed the door open;

8)    Lead Officer ordered and watched Bridges comply with the order to put his hands up, lift his shirt, and turn around;

9)    Lead Officer told Bridges that a call had come in of a possible domestic involving a man and a woman yelling.

10)   Lead Officer heard Bridges say that nothing was going on and no woman was  there and only he and his son were there playing video games and he had asked his son to clean his room;

11)   Lead Officer asked Bridges to let him come in;

12)   Back-up Officer heard Bridges say that nothing going on and saw him start to close the door;

13)   Lead Officer and the Back-up Officer convinced Bridges to leave the door open and to continue to talk to them;

14)   Lead Officer again asked Bridges to let him come in;

15)   Lead Officer, followed by the Back-up Officer, entered Bridges' residence;

16)   Bridges began backing up;

17)   Bridges was ordered to sit on the couch at least twice;

18)   Bridges was taken down to the floor;

19)   Bridges refused to take his hands from between his body and the floor;

20)   Back-up Officer Tasered Bridges at least twice; and

21)   Bridges was secured.

While a great deal occurred (1-15) between police arrival and their entry, there is nothing in those events or during that time frame to substantiate to a reasonably objective police officer that a domestic violence event had occurred at, or that there was a victim within Bridges' residence.

Moreover, the brief time is indicative that the police did not conduct the type of investigation – the checking of facts – prior to entry that the police conducted in the other cases reviewed herein.

In analyzing the events of October 30, 2007, the undersigned would be remiss in not considering the possibility that Bridges simply acquiesced in the search, gave up at the authoritative insistence of the police officers, and consented to their entry into his home. First, however, there is not a reasonable factual basis to conclude that Bridges let the police in believing they only wanted to look in the front room. They told Bridges they wanted to check the house to assure themselves no one was injured inside. He knew his house and knew the police could already see the front room and dining room standing from the front door. No one testified at the evidentiary hearing that Bridges believed the police would be satisfied with coming in to look at the same area they could see from the open doorway.

Second, to conclude Bridges acquiesced and consented discounts as incredible Bridges' testimony that he told the police they could not come into his residence and that "[b]asically, they [police] just made their way into the apartment" as he was trying to close the door. Tr. 93-94, 104-105, 111. The weight of the evidence does not support such a conclusion.

It is corroborated by the officers themselves that Bridges tried to close his door. As previously stated, his desire to close the door, along with the other evidence, supports the actions and words of Bridges to deny the police access to his residence in order to prevent them from discovering his marijuana. A finding that Bridges left the door open instead of closing it in the faces of the police, is not inconsistent with his desire to close it in the first place. Bridges made it clear to the police even as they came into his residence that he did not want them there. Tr. 95. Bridges' leaving the door open at the insistence of the police was simply respectful acquiescence to the

46

officers' authority, just as his not jumping and tackling a police officer as the officer entered his home was simply his respectful acquiescence to the police officers' apparent and vocalized authority and the wise use of discretion over youthful valor. Tr. 94.

There is no written consent to enter in this case. While the undersigned is aware that no written consent is required, a written consent would ordinarily go to support the voluntariness of any consent given, and would also be an easy way to substantiate the claim that consent was in fact given. _Boone_, _supra_ at 662.[14]

After reviewing the totality of the evidence presented during the hearing, the demeanor of the witnesses on the witness stand, their apparent biases and interests or lack of interest in the outcome of the pending litigation, their opportunity to know the facts to which they testified, and their consistency and inconsistencies, the undersigned concludes that the government has not shown, by a preponderance of the evidence, that Bridges told the police to come in to his home to look around. It is possible that, in their zeal to do a welfare sweep of the residence and given Lead Officer's pre-conceived belief that he did not need a warrant or consent, Lead Officer misinterpreted Bridges' comment that they could see that "nothing was going on" as an the invitation he was seeking and improperly entered. Once he started in Back-up Officer had no choice but to follow to protect Lead Officer. The truth of what actually took place is locked in the minds of those present and will never be known with any certainty.

Accordingly, the undersigned further finds and concludes that the United States' position that Bridges acquiesced and consented to the police voluntarily entering his home is an

---

[14]The City of Bridgeport has no written protocol or training manual giving guidance to its police officers on how to respond with respect to 911 suspected domestic calls.

unsubstantiated possibility and is not supported a preponderance of the evidence presented during the suppression hearing. *United States v. Vickers*, *supra*, citing *Wren v. United States*, 352 F.2d 617 (10th Cir. 1965).

Since the undersigned does not find that a preponderance of the evidence substantiates the claim that Bridges uttered words of consent, the undersigned does not address whether any such alleged consent was freely and voluntarily given.

A search prosecuted in violation of the Constitution is not made lawful by what it brings to light. Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. Therefore, the fact that a bag of marijuana and related paraphernalia was found during the sweep search and the later warranted search, is not justification for an otherwise unconstitutional search.

## IV.

For the reasons herein stated, the undersigned accordingly recommends Defendant Bridges' Motion to Suppress, as joined in by Defendant Oliverio, be **GRANTED**. The undersigned further recommends that the bag of marijuana located during the initial welfare sweep which formed the basis for the later state magistrate search warrant and all contraband evidence seized as a result of the later search pursuant to that search warrant be suppressed under the "fruit of the poisonous tree" doctrine.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and

Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 4th day of April, 2008.

*John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE