IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

     Plaintiff,

v.           //     CRIMINAL ACTION NO. 1:08CR5
                             (Judge Keeley)

CORY BRIDGES and
MEGAN ROSE OLIVERIO,

     Defendants.

## MEMORANDUM OPINION AND ORDER ADOPTING
## REPORT AND RECOMMENDATION

The defendants, Cory Bridges ("Bridges") and Megan Rose Oliverio ("Oliverio") (collectively the "defendants") have filed a motion to suppress certain evidence obtained during a search of their residence. For the reasons that follow, the Court **ADOPTS** the Report and Recommendation ("R&R") of Magistrate Judge Kaull in its entirety, **GRANTS** the motion and **SUPPRESSES** the evidence.

### I. Procedural Posture

On February 19, 2008 the defendants filed a motion to suppress certain evidence obtained during a search of their home. After this Court referred the matter to him, United States Magistrate Judge John S. Kaull held a hearing on April 4, 2008, following which he filed an extensive, forty-nine page opinion recommending that this Court grant the motion and suppress all evidence gathered through both the preliminary warrantless "safety check" and the subsequent search pursuant to a search warrant.

**MEMORANDUM OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION**

On April 18, 2008, the government briefed its objections to the R&R, to which the defendants filed no response.  The matter, therefore, is ready for this Court's <u>de novo</u> review.

## II.  Legal Standard

The privacy of a person in his or her own home is the heartland of the Fourth Amendment.  <u>United States v. Wilhelm</u>, 80 F.3d 116, 120  (4th Cir. 1996).  Physical invasion of a person's home is the "chief evil" against which the Fourth Amendment is directed.  <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980).  The "touchstone of the Fourth Amendment is reasonableness."  <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967).  "[S]earches and seizures inside a home without a warrant are presumptively unreasonable."  <u>Groh v. Ramirez</u>, 540 U.S. 551, 559 (2004).  The United States Supreme Court has recognized that such a warrantless search may nonetheless be reasonable and constitutional if there is either consent or certain exigent circumstances exist.  <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398,  403 (2006).

Courts must consider the totality of the circumstances in a "highly fact-dependent inquiry" when determining whether a search was executed in a reasonable manner.  <u>Dalia v. United States</u>, 441 U.S. 238, 257 (1979).  The proper test of reasonableness is whether, under the circumstances confronting the officers and

disregarding their intent or motivation, their conduct was objectively reasonable, not whether another course of action would have been more reasonable. Graham v. Connor, 490 U.S. 386, 397 (1989); Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curium).

The "fruit of the poisonous tree doctrine" excludes evidence which is otherwise admissible because the impetus for gathering the evidence came from a previous Fourth or Fifth Amendment violation. Missouri v. Seibert, 542 U.S. 600, 612 n.4 (2004). The purpose of the rule is to discourage law enforcement from violating the constitutional rights of defendants by excluding the evidence gained from such a violation. Id.

### III. Analysis

The government has grouped its objections to focus on the key issues of consent and exigent circumstances. This opinion will focus on each issue in turn.

### A. Consent

The first group of objections challenges the legal conclusion that the government failed to carry its burden of showing, by a preponderance of the evidence, that Bridges consented to the initial search. The government argues that many of the "undisputed" facts listed in the R&R are, in fact, disputed. As will become evident from a review of the facts in this case,

**MEMORANDUM OPINION AND ORDER ADOPTING**
**REPORT AND RECOMMENDATION**

however, the testimony of the government's own witnesses supports the factual findings of Magistrate Judge Kaull.

1.

On October 30, 2007, Officer Williams ("Williams") of the Bridgeport Police Department received a dispatch call on the radio about a possible domestic violence incident at the Bridges-Oliverio residence located in Bridgeport, West Virginia. Tr. 4-5. When he arrived at the residence, he heard no noise coming from the house, nor did he see anything out of the ordinary. Tr. 19. He knocked on the door three times. Tr. 5. Only after he knocked on the door for a third time did he hear a male voice inside the residence. Tr. 5. Williams told the person on the other side of the door that it was the police and directed him to open the door. Tr. 6. The person on the other side of the door was Bridges. Tr. 7. Bridges opened the door part way and began speaking to Williams, who then forced the door open the rest of the way in order to view Bridges's entire body. Tr. 6-7. Williams then conducted a weapons check on Bridges by asking him to pull up his shirt and turn around. Tr. 7. Bridges complied. Id. Williams found no weapons or other contraband during the weapons check. Tr. 26. Nothing about Bridges's demeanor or appearance appeared abnormal. Tr. 22. Nor was the appearance of the living room abnormal. Tr. 25. About

**MEMORANDUM OPINION AND ORDER ADOPTING**
**REPORT AND RECOMMENDATION**

that time, Officer Floyd ("Floyd"), a second officer from Bridgeport, arrived and took a position behind Williams. Tr. 6.

Williams advised Bridges that he had arrived after receiving a call regarding possible domestic violence involving a female. Tr. 8. Bridges stated there was no domestic problem and that no female was in the residence at that time. <u>Id.</u> Bridges attempted to explain away the sounds the neighbor may have heard as either coming from video games or from a discussion he'd had with his son about cleaning his room. <u>Id.</u>

The officers observed Bridges's son, who was standing in the back of the room during this exchange. Tr. 9. The son appeared to be seven to ten years old. Tr. 24. Nothing about his appearance was abnormal. Tr. 22. The officers never questioned him before entering the house. Tr. 24. In the area of the house that the police could view from the front door, they saw no injured person. Tr. 25. They did not call out to learn if anyone would answer. <u>Id.</u> In short, at that time, other than a domestic report from an anonymous 911 call, the officers had no evidence that a crime had been committed. Tr. 21.

At some point, Bridges attempted to end the conversation and shut the door to his house. Tr. 43, 58. The police officers immediately called out to him and told him to reopen the door. Tr.

**MEMORANDUM OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION**

58.  Bridges complied and the officers continued their conversation with him.  Tr. 58-59.

According to Williams, from his training he understood that, at the moment that Bridges reopened the door, he had the right to enter the home to conduct a warrantless safety check without regard to whether he had obtained consent.  Tr. 24, 34.  Based on the same training, however, Floyd believed that he and Williams were required to wait outside, remain observant and keep requesting consent to enter until they had either obtained consent or observed something that gave them the legal right to enter the home without consent.  Tr. 60-61.  In any event, it is undisputed that, at some point, with or without consent, Williams and Floyd entered the home.  Tr. 27.  Shortly after their entry, Bridges disobeyed their commands and began to move toward the back of the house.  Id.  He claimed to be retrieving some socks because his feet were cold.  Id.  The officers stopped him, took him to the ground and used a taser on him at least twice.[1]  Tr. 31.  They then handcuffed Bridges.  Tr. 12.

---

[1]  The disputed number of taser shocks, two versus five, is not of particular constitutional significance in this case at this point because the heartland issues raised by the defendants are consent and exigent circumstances, neither of which depends on whether the use of the taser in connection with Bridges's arrest was reasonable.  Nonetheless, the Court notes that the use of a taser in the execution of a search may call into question its reasonableness.  See Orem v. Rephann, 523 F.3d 442, 456 (4th Cir. 2008).

**MEMORANDUM OPINION AND ORDER ADOPTING**
**REPORT AND RECOMMENDATION**

After Bridges was subdued and detained in the living room, Williams conducted a safety check and looked through the house for anyone who might be injured. Tr. 13. As he did so, he found a bag of marijuana in plain view in the back living room. Tr. 15. After discovering the marijuana, Williams completed his safety check, following which he and Floyd left the house with Bridges. Tr. 34-37. As they transported Bridges to the hospital for medical attention, other police officers remained on the scene to secure the house while a search warrant was obtained. Tr. 34-37, 51.

At some point after Williams and Floyd withdrew from the house, but before the police obtained a warrant, Oliverio came home.[2] Tr. 53. When the waiting police officers asked her to leave the house, she complied. _Id._ Meanwhile, the officers obtained the warrant, entered the house and seized the marijuana. Tr. 53-54.

2.

In the recent case of United States v. Mowatt, 513 F.3d 395, 400 (4th Cir. 2008), the Fourth Circuit held that, even if there is

_____

    [2]   The government, both during the hearing and in its objections to the R&R, argues that the lack of a receipt or other documentation belies Oliverio's statement that she was out of the house for approximately one and one half to two hours prior to the police's arrival, or that she was shopping during that time. It is undisputed, however, that she was not at home when the police conducted a safety check of the house and she returned while the police were awaiting the search warrant.

7

no physical invasion, a search under the Fourth Amendment occurs whenever a police officer gains visual access to the interior of a person's home under color of authority.  In <u>Mowatt</u>, police received a complaint from a private security guard about loud music and the smell of marijuana emanating from the defendant's apartment.  <u>Id.</u> at 397.  When they arrived, the police also heard the loud music and smelled the odor of marijuana.  <u>Id.</u>  When they knocked on the door, the occupants did not respond so the police then pounded on the door.  <u>Id.</u>

While pounding on the door, the police heard people moving around and an aerosol can discharging inside the apartment.  <u>Id.</u> Someone then reduced the music volume and, with the door still closed, asked who was at the door.  <u>Id.</u>  The officers responded "It's the police.  Open the door.  We need to investigate something." <u>Id.</u>  Although Mowatt initially refused, he eventually opened the door about a foot after the police repeatedly demanded that he do so.  <u>Id.</u>

The officers continued to insist that Mowatt let them into the apartment.  <u>Id.</u>  When Mowatt asked the police if they had a search warrant, the police admitted that they did not.  <u>Id.</u>  Because of the way Mowatt was positioned in the doorway, the police could not see his entire body and became concerned that he might be hiding a weapon.  <u>Id.</u>  When Mowatt continued to refuse to open the door so

that the police could view both of his hands, one of the officers reached into the apartment and grabbed his right shoulder.  Id. Mowatt slapped the officer's hand away.  Id.  At that moment, the police forced their way into the apartment and wrestled Mowatt to the floor.  They learned that he did not possess a weapon.  Id.

After securing Mowatt, the officers handcuffed him and placed him in a chair in the living room.  Id. at 398-99.  While one of the officers stayed with Mowatt, the other conducted a quick sweep of the interior of the apartment, looking for other people.  Id. at 399.  Although the officer found no one else, he did find a loaded revolver in plain sight.  Id.  At that moment, a commotion in the living room caused the officer who was sweeping the apartment to return to the living room, where he found the second officer struggling with a still-handcuffed Mowatt.  Id.  The struggle spilled into the kitchen, where Mowatt and the officer slammed against the refrigerator.  Id.  Mowatt was eventually brought under control, but the refrigerator door was left standing open as a result of the struggle.  Id.

Peering into the open refrigerator, the police saw a plastic bag containing several hundred pink pills.  Id.  Based on his training and experience, one of the officers believed that the bag contained ecstasy.  Id.  At that point, the officers transported Mowatt to a hospital for medical attention and withdrew from the

apartment to await a search warrant. <u>Id.</u> Once the warrant arrived, the police reentered the apartment, seized the revolver with six rounds of ammunition, as well as a bag containing hundreds of ecstasy pills, two semiautomatic assault rifles with ammunition, a body armor vest, and approximately $20,000.00 in cash. <u>Id.</u>

Mowatt moved to suppress all the evidence, which the district court denied. <u>Id.</u> at 398-99. Mowatt was later convicted by a jury on all counts and sentenced to 197 months of incarceration. <u>Id.</u> at 399.

On appeal, the Fourth Circuit reversed the district court's denial of the defendant's motion to suppress. <u>Id.</u> After establishing the baseline rule of law that warrantless searches of a home are presumptively unreasonable, our circuit concluded that the initial demand to open the door was, itself, an unreasonable search. "`No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons.'" <u>Id.</u> at 401(<u>quoting Johnson v. United States</u>, 333 U.S. 10, 15 (1948)). The Fourth Circuit found that there was no reason for the police to have Mowatt open the door since any conversation they needed to have could have occurred with the door closed. <u>Id.</u>

### MEMORANDUM OPINION AND ORDER ADOPTING
### REPORT AND RECOMMENDATION

In the case under review, it is undisputed that Bridges partially opened the door only after Williams announced his presence as a police officer and made a demand that he open the door. It is also undisputed that Williams then pushed the door open farther. The officers do not deny that, before they entered his home, Bridges had attempted to terminate the conversation by shutting the door. The officers then demanded that he reopen it.

A person usually has the legal right to shut the door to his dwelling in someone else's face. United States v. Cephas, 254 F.3d 488, 495 (4th Cir. 2001). Consequently, by ordering Bridges to reopen the door, the police were acting under color of authority. Significantly, all of these events occurred before Williams and Floyd allege that Bridges consented to the search. In other words, even under the government's theory of the case, it is undisputed that Bridges had not yet consented to a search when he was ordered to reopen the door. Furthermore, unlike the circumstances in Mowatt, where the police heard loud music and smelled marijuana before knocking on the door, it is also undisputed that neither Williams nor Floyd had observed unusual or criminal activity afoot prior to entering the home.

3.

Based on these events, three non-consensual searches involving Bridges's home occurred before the allegedly consensual search

11

occurred. The first search occurred when Williams announced his presence and ordered Bridges to open the door. The second search occurred when Williams pushed the front door open further in order to better observe Bridges and the interior of his living room. The third search occurred after Bridges closed the door, when Williams demanded that he reopen the door, following which Bridges complied. After this point, the police allege that Bridges consented to the search by saying words to the effect of "Go ahead and check, but you won't find anything." Tr. 9. Bridges, however, denies giving consent. Tr. 94.

In weighing the credibility of the witnesses, the Court is well aware that all three of them have an interest in the outcome of this motion. Williams and Floyd obviously have an interest in having the constitutionality of their search validated. No officer wants to commit an error that results in a criminal going free due to the suppression of incriminating evidence. On the other hand, Bridges is strongly motivated to remember events in a way that invalidates the search. If this evidence is suppressed, he and Oliverio will go free. Otherwise, they risk conviction and incarceration for federal drug offenses. After weighing the witnesses' credibility, this Court finds that the government has failed to carry its burden of establishing consent to the search by a preponderance of the evidence. A preponderance of the evidence

**MEMORANDUM OPINION AND ORDER ADOPTING**
**REPORT AND RECOMMENDATION**

means that it is more likely than not that something is true. Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 (1997). The government's evidence fails to persuade that it is more likely that Bridges gave consent than it is that he refused to consent to the search of his home.

The credibility of the police officers was damaged by admissions they made during the hearing that they had misstated the events at Bridges's home in the report they authored only minutes after the incident. Tr. 56-57. Written by Floyd, the report stated that Williams had heard yelling coming from inside the residence as he approached. Tr. 56. The criminal complaint, filed only hours after the incident, also stated that both officers had heard yelling. Id. On cross-examination, however, Floyd admitted that both of these statements misstated the facts. Tr. 57. Moreover, during the hearing, both officers admitted they had heard no noise, nor had perceived anything unusual, prior to entering Bridges's home. Tr. 19, 57.

In the Court's view, these misstatements are material; had they actually heard any yelling as they approached the house, the officers might have been able to establish that exigent circumstances justifying a warrantless search existed. Their false police report, filed only minutes after an incident, as well as the false criminal complaint filed only hours after the incident,

damages their credibility and, specifically, their testimony about what occurred at the time they searched Bridges's home. Furthermore, Bridges's behavior, which apparently was so non-compliant that he had to be forcibly subdued with handcuffs and a taser, supports his testimony that the search of his house was non-consensual. Therefore, because the government has failed to carry its burden of establishing consent to search by a preponderance of the evidence, the Court **OVERRULES** the government's objections **ADOPTS** that portion of the R&R.

### B.  Exigent Circumstances

The government's second group of objections challenges Magistrate Judge Kaull's legal conclusion that it failed to carry its burden of establishing, by a preponderance of the evidence, that exigent circumstances existed that rendered the officers' warrantless search of Bridges's home constitutional. Once again, the government objects to many of the "undisputed" facts in the R&R. Again, the Court finds that the testimony of the government's own witnesses at the evidentiary hearing supports the factual findings of Magistrate Judge Kaull.

### 1.

According to those findings, prior to entering Bridges's home, other than the alleged domestic violence reported in an anonymous 911 call, the officers had no evidence to believe that a crime had

been committed.  Tr. 21.  The government argues that a domestic

call alone, without more, can provide the exigent circumstance that

allows an officer to conduct a warrantless safety check of a

residence, and cites United States v. Gwinn, 46 F. Supp. 2d 479

(S.D.W.Va. 1999), in support of its position.

In Gwinn, Anna Terry, the mother of Dianne Harrah, called 911

and said

> My daughter is living up there with a guy named Dennis
> Gwinn, and she just called me real fast and told me to
> call the police. . . . And she told me that he's got a
> gun in there by the door and he told her he was going to
> kill her.

Id. at 482.  Ms. Terry also told the 911 dispatcher that Ms. Harrah

had a baby with her.  Id.  Three police officers were dispatched to

the scene.  The first police officer on the scene called for Gwinn

to exit the trailer, and Gwinn complied.  He walked onto the front

porch and then over to the police vehicle, wearing neither  shirt

nor shoes.  Id.  The police officer could "smell alcohol all over"

him, conducted a safety check of Gwinn and handcuffed him.  Id.

After securing Gwinn, the police officer asked him where his

wife was.  Id.  Gwinn responded that his girlfriend (she was not

his wife) was in the trailer.  Id.  At that point, two other police

officers arrived.  Id.  One stayed with Gwinn while the other two

approached the trailer.  Id.

**MEMORANDUM OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION**

They found the front door to the trailer open, but noted that the screen door was closed.  Id.  Peering through the screen door, they could see Ms. Harrah sitting on the couch with her baby.  Both were crying.  Id.  The two police officers entered the home to calm her and her baby.  Id.  Once she had regained some composure, the police questioned her about what had happened.  Id.  She voluntarily told them that Gwinn had gotten a blue revolver out and threatened to kill her if she left him.  Id.  While one police officer was talking to Ms. Harrah, the other officer conducted a protective sweep of the remainder of the house.  Id.  The sweep did not locate any contraband.  Id.

After returning from the protective sweep, the police officers questioned Ms. Harrah further about the gun.  Id. at 483.  Without asking her permission to conduct a search, one of the officers searched around the outside of the trailer and then searched the living room.  Id.  His search of the living room produced a shotgun hidden under the couch.  Id.

Under those circumstances, the court found that the police officers' entry of the home was proper due to the exigent circumstance of seeing a woman and baby in apparent distress.  Id. at 482.  The court also found that the safety sweep was proper.  Id.  Once the police officer had completed his safety sweep, however, the further search that yielded the shotgun was

unreasonable and violated the Fourth Amendment.  Id. at 483.  Thus, the police needed either consent or a warrant before conducting any further searches.  Id. at 482.

The government argues that the facts in this case are similar to those in Gwinn that warranted the officers' initial entry, and contends that the police officers properly entered Bridges's home to conduct a safety sweep.  There are substantial factual differences between Gwinn and this case, however.  In Gwinn, the 911 call from Ms. Harrah's mother specifically indicated that Gwinn had a gun and was threatening to kill Ms. Harrah, and that there also was a baby in the trailer.  Gwinn, 46 F. Supp. 2d. at 482. The only information the officers in this case had when they arrived at Bridges's residence was an anonymous 911 call about a possible domestic episode. Tr. 19, 57.

In Gwinn, when the first officer arrived, he encountered a drunken Gwinn, whom he searched and secured with handcuffs.  Gwinn, 46 F. Supp. 2d. at 482.  As the other two officers approached the trailer, they could see through the screen door that Ms. Harrah, the alleged victim of domestic violence, was sitting on the couch sobbing, with her crying baby.  Id.  The sight of Ms. Harrah in apparent distress and in need of assistance thus created an exigent circumstance that permitted the officers to properly enter the home without a warrant.

By contrast, the officers here observed nothing out of the ordinary before they entered Bridges's home. Tr. 19, 57. There was no one hurt, crying or otherwise in danger. Tr. 25. Consequently, no exigent circumstance existed.

2.

The government also relies on State v. Greene, 784 P.2d 257 (Ariz. 1989), where a police officer, responding to a 911 call of a possible episode of domestic violence at a residence, saw the alleged victim, her mother and baby inside the apartment through a window. Id. at 257. The officer walked through an open patio door and approached the victim, Mrs. Greene, who told him that her husband had beaten her, smashed up the living room and bathroom, and then fled in her car. Id. After the officer obtained a physical description of the defendant from Mrs. Greene, he went with her to the bathroom, where he took photos of the damage. Id. at 432. While the police officer was taking photos, Mrs. Greene carried on a conversation with him. Id. During this conversation, she walked into her bedroom to gather some items. Because he had trouble hearing her, the police officer followed her into the bedroom, where he noticed some Hawaiian leis hanging on a doorknob. Id.

Following this discovery, he asked some additional questions and began to suspect that Greene may have committed a recent

unsolved sexual assault. <u>Id.</u> Ultimately, Greene was arrested for a probation violation and confessed to the sexual assault offense when confronted with the evidence against him. <u>Id.</u>

Greene later moved to suppress this evidence, which the trial court granted. <u>Id.</u> The Supreme Court of Arizona reversed and remanded the case, however, holding that exigent circumstances justified the warrantless search or, alternatively, that Mrs. Greene had implicitly consented to the search. <u>Id.</u> at 259.

The government cites <u>Greene</u> for the proposition that exigent circumstances exist whenever "a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained." It asserts that both <u>Greene</u> and this case involved such a situation. A comparison of the different facts in each case, however, establishes that this argument is not well-founded.

While in both cases police officers went to a residence in response to a 911 domestic violence call, that is where the factual similarity between this case and <u>Greene</u> ends.[3] As the officer in

---

[3]  The court in <u>Greene</u> does not specify whether the 911 call was anonymous or what amount of information was available to the officer from that call. The opinion also does not specify with any detail exactly what the police officer saw before entering the home. It does, however, state that the officer was able to identify that Mrs. Greene was the victim of domestic violence from his vantage point, peering through a window, and that she was accompanied by her mother and her baby. <u>Greene</u>, 784 P.2d at 257.

Greene approached the house, he saw that the alleged victim of the domestic violence and her baby were inside. Id. at 257. He did not know at that moment whether Greene might also be in the residence and, thus, whether the occupants might be in danger. In this case, the police officers never saw or heard a female or observed anything out of the ordinary before they entered Bridges's house. Tr. 19, 57. Moreover, while outside, they saw a young child who by their own admission appeared perfectly normal and unharmed. Tr. 22.

In Greene, the officer entered through an open patio door and immediately began speaking to Mrs. Greene. Greene, 784 P.2d at 257. Mrs. Greene, in turn, voluntarily told him that her husband had beaten her, smashed up a couple of rooms, and had left. Id. at 258. Mrs. Greene never objected to the officer's presence in her house. Id. Once the officer had spoken to Mrs. Greene, he had information that a crime had been committed and, arguably, her consent to remain in the home, given that Mrs. Greene voluntarily led him into the bathroom. Id. The entire interaction, therefore, was friendly and consensual. Id.

In stark contrast, Bridges did not welcome Williams and Floyd into his home; indeed, he objected to their presence and attempted to terminate the conversation by shutting the door. Tr. 43, 58.

**MEMORANDUM OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION**

The officers then forcibly subdued him after he refused to comply with their orders.  Tr. 31.

Among the many distinctions between these two cases, one stands out as particularly striking.  That is the fact that Williams and Floyd, by their own admission, saw nothing out of the ordinary to indicate that a crime had been committed.  Tr. 25.  The officer's entry in <u>Greene</u>, by contrast, was prompted by seeing a woman in distress who appeared to be a domestic violence victim.  Unlike the police officer in <u>Greene</u>, therefore, Williams and Floyd had no information to establish the likelihood of exigent circumstances.

IV.  Scope of the Fourth Amendment

The Fourth Amendment strongly protects a person's right to be free from government interference in his or her own home.  <u>United States v. Wilhelm</u>, 80 F.3d 116 (4th Cir. 1996).  Non-consensual physical entry into a person's home by government agents is the "chief evil" the Fourth Amendment seeks to prevent.  <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980).

Of course, this Court is cognizant of the need to protect victims of domestic violence.  <u>Riccobene v. Scales</u>, 19 F. Supp. 2d 577, 581 (N.D.W.Va. 1998).  Nevertheless, good intentions by police officers alone are insufficient to render a search constitutional.  <u>Byars v. United States</u>, 273 U.S. 28, 29 (1927).  The intrusiveness

21

of the right the government is claiming here cannot be overstated.
To hold as a <u>per se</u> rule that the police have the power to search
a private residence without consent whenever they receive an
anonymous tip of a possible domestic violence episode would
eviscerate the Fourth Amendment's protections of the sanctity of a
person's home. This Court declines to hold that pretextual searches
based on bare allegations of a connection to domestic violence are
constitutional.

For the Fourth Amendment to mean anything, it must mean that
the government may not enter a private home, absent consent, unless
it has a warrant or exigent circumstances exist. Had someone been
crying, or had the officers truly heard yelling, one might argue
the presence of an exigent circumstance.  <u>See</u> <u>Brigham City v.
Stuart</u>, 547 U.S. 398, 406 (2006); <u>United States v. Gwinn</u>, 219 F.3d
326, 329 (4th Cir. 2000).  Had Bridges or his son been injured,
perhaps one could claim an exigent circumstance. <u>Brigham City</u>, 547
U.S. at 403.  Had the officers observed broken furniture, glass or
blood on the floor in the living room, had there been a fire, or
had the officers seen a weapon or drugs before they pushed the door
open, the government could argue the presence of exigent
circumstances.  <u>United States v. Dunn</u>, 480 U.S. 294, 304 (1987);
<u>Texas v. Brown</u>, 460 U.S. 730, 739 (1983); <u>Michigan v. Tyler</u>, 436
U.S. 499, 509 (1978); <u>United States v. Roberts</u>, 166 Fed. Appx. 80,

83 (4th Cir. 2006)(unpublished).    None of these circumstances existed when Williams and Floyd entered and searched Bridges's residence, however.  There was simply no evidence of domestic violence or some other exigent circumstance that justified their entry.

In his R&R, Magistrate Judge Kaull thoroughly surveyed the relevant case law from various courts around the country and concluded that no American court has ever recognized an exception to the Fourth Amendment of the breadth urged here.[4]

The Court agrees with Magistrate Judge Kaull's R&R that no exigent circumstances existed and **ADOPTS** its conclusion that the safety check, therefore, was an unreasonable warrantless search in violation of the Fourth Amendment.

V.   Conclusion

Because the initial search of the defendants' residence where marijuana was first discovered was unconstitutional, the subsequent search pursuant to a warrant must be suppressed as the fruit of the poisonous tree.  Missouri, 542 U.S. at 612 n.4.  The Court **ADOPTS** the Report and Recommendation in its entirety, **GRANTS** the

---

[4]   In fact, the Tenth Circuit has explicitly declined to create "a special rule for domestic calls because they are inherently violent and the police responding to these calls are automatically at greater risk."  United States v. Davis, 290 F.3d 1239, 1244 (10th Cir. 2002).

**MEMORANDUM OPINION AND ORDER ADOPTING**
**REPORT AND RECOMMENDATION**

defendants' motion (dkt. no. 25) and **SUPPRESSES** all of the evidence

from both searches.

It is so **ORDERED.**

The Clerk is directed to transmit a copy of this Order to

counsel of record, the defendants and all appropriate agencies.

Dated: June 12, 2008.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE